**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

NOLAN SIDNEY BIESANZ, JR.                                    PLAINTIFF

v.                              CASE NO.: 10-5017

SHERIFF KEITH FERGUSON *et al.*                              DEFENDANTS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Nolan Sidney Biesanz, Jr. ("Plaintiff"), currently an inmate in the Cummins Unit of the Arkansas Department of Correction ("ADC") in Grady, Arkansas, filed this civil rights action under 42 U.S.C. § 1983.  Pursuant to the provisions of 28 U.S.C. § 636, this case is before the undersigned upon referral of the Honorable Jimm Larry Hendren, Chief United States District Judge for the Western District of Arkansas.

An evidentiary hearing was held before the undersigned on September 26, 2011.  The undersigned issues the following recommendation based upon the evidence presented at that hearing.

I.   **Background and Evidence Presented**

Plaintiff presents a claim for unconstitutional conditions of confinement in the Benton County Detention Center ("BCDC") and names the following defendants in both their individual and official capacities: Sheriff Keith Ferguson; Captain Hunter Petray; Jail Commander Rob Holly; and David Bisbee, former County Judge of Benton County and member of the Benton County Quorum Court.  As a threshold matter, the undersigned notes that at the hearing Plaintiff moved to voluntarily dismiss Defendants Petray and Bisbee

from this action, with prejudice.  Defendants made no objection to Plaintiff's motion, and it is recommended that Defendants Petray and Bisbee be dismissed from this matter on Plaintiff's motion, pursuant to Federal Rule of Civil Procedure 41(a)(2).  As such, the undersigned will only consider Plaintiff's claims related to Defendants Holly and Ferguson, and his official capacity claims against Benton County.

At the evidentiary hearing, testimony was presented from the following witnesses: (1) Walter Fry; (2) Robert Clinard; (3) Juan Perez; (4) Plaintiff; (5) Robert Holly; (6) Hunter Petray; and (7) Keith Ferguson.

In addition to the testimony of witnesses, the following exhibits were also admitted:  Plaintiff admitted exhibits numbered one through eight and ten through fourteen into evidence; Defendants admitted exhibits numbered one through six into evidence.

Below is a summary of the testimony presented at the evidentiary hearing.

**Plaintiff's Version of Events**

Plaintiff was incarcerated in the BCDC from January 7, 2009, until March 3, 2010.  He was convicted on September 17, 2009.  From January 7, 2009, until September 17, 2009, while a pretrial detainee, Plaintiff was housed in an area of the BCDC referred to as D149.  Plaintiff spent the remainder of his confinement in D102.

While housed in D149, Plaintiff was specifically assigned to cells 142 and 144 at different times during his incarceration. The cell block was set up with cells consisting of two beds, a desk, and a sink and toilet. Those cells faced a "day room" which was an open area with picnic-style tables and chairs. During the day, the cells would be locked to inmate access, except for one cell, which was open to be used as a restroom by the inmates. Plaintiff states that the majority of the time, his cell – 142 – was used as the "public restroom." Also, for a week to a week and a half after he was given another cell assignment, his other cell – cell 144 – was also used for this purpose.

Plaintiff's main complaint regarding his cell being used as the common restroom during the times inmates were locked out of their cells is an issue of cleanliness. Plaintiff complained he had to endure foul odors and a lack of cleanliness from the restroom usage. Cleaning supplies were available after breakfast, and were provided in a first-come-first-serve manner. Typically, two one gallon size jugs of cleaner would be set out for approximately 30-45 minutes worth of use by the inmates. There were two mop buckets to be shared among the sixteen cells in the cellblock and the dayroom area. The inmates would attempt to save some of the cleaning product for the public restroom cell. However, Plaintiff often was not allowed to clean a second time in

-3-

the afternoon or evening, although there were times he was allowed to do so.

Plaintiff agreed that from January 2009 until September 2009 he was able to clean his cell at least in the morning. However, inmates complained of noise from cleaning crews in the dayroom at night, and it became a trustee job to clean the dayroom at night. Although the trustees would clean at night, they would also go through six cell blocks without changing the water they used for cleaning. Also, the trustees would not wipe tables or phones, nor did they clean Plaintiff's cell at night – trustees only cleaned the common areas. When Plaintiff was unable to clean his cell at night, the cell smelled of a foul odor.

At times not designated specifically for cleaning, Plaintiff could request cleaning supplies, but they would not always be provided. Perez, who was Plaintiff's cellmate for a time, corroborated this fact. Perez also testified that fecal matter would be on the floor and wall often due to the use of the cell as the public restroom.

Plaintiff also complained that due to overcrowding, he was forced to sleep on the floor at various times. Sometimes it would be a couple of consecutive nights of having to sleep on the floor, and at other times, it would be up to a week in duration. Plaintiff estimated he spent at most two to three months of his

fourteen months of incarceration sleeping on the floor, but acknowledged that he had a mat at all times.

Although he had a mat, Plaintiff had to place his mat on the floor with his head near the toilet.  Other inmates would use the toilet during the night, causing him to be stepped on or even urinated on by another inmate on two to three occasions.  Plaintiff stated that via grievances, Ferguson and Holly were aware of the issues he encountered due to sleeping on the floor.

Plaintiff also testified that he was deprived of sleep due to a light which was left on over the bunks all night long, disturbing his sleep.  The light fixture consisted of three bulbs, with the middle one dimmed to about 65/70 watts and left on at night.  Plaintiff wrote grievances about the light because he was unable to shield himself from it, and he was only able to sleep four to five hours at night.  The grievances submitted by Plaintiff regarding the light were never returned.

Inadequate ventilation is another of Plaintiff's conditions of confinement claims.  Plaintiff testified that the cells were very cold in the winter, and hot in the summer and estimated that the corner cell, 145, where he was housed for some of his pretrial detention, dropped to below 65 degrees for approximately one week in the winter.  In February of 2009, Plaintiff wore an extra shirt to try to keep warm, and it resulted in him being locked down for possessing an extra item in his cell.  Plaintiff testified that in

-5-

the summer, the temperature could get above 80 degrees, especially during a seven-day period when the air conditioner went out. Plaintiff agreed the Defendants worked as quickly as they could to restore the air conditioning and that they allowed inmates to wear fewer clothes than was the normal rule to accommodate the increased temperatures.

Plaintiff testified that there was also a lack of adequate hygiene items for indigent inmates, such as himself. According to Plaintiff, indigent inmates received a travel size bar of soap once a week and a travel size toothpaste every two or three days; deodorant and cotton swabs were not provided. If an inmate ran out of toothpaste or soap, he had to request additional supplies from a jailer. Plaintiff estimated that during his detention at the BCDC, he may have been out of toothpaste and soap for up to two to three days. Toilet paper was also handed out to each inmate, although the toilet paper in the public restroom cell was used by all. Plaintiff acknowledged that he was never without toilet paper, as he was always able to borrow some from other inmates or get more from a jailer.

Plaintiff testified that he also had to forgo a shower, although only for one day, because inmates could only shower when the more aggressive inmates would allow them access to the shower area. Perez also testified that it was the assertive inmates who controlled the showers and other shared items in the pod.

-6-

Additionally, at times the inmates would wait two weeks to have their sheets laundered and the blankets would only be laundered every three weeks.

Finally, Plaintiff testified that he received inadequate nutrition at the BCDC. Plaintiff filed a menu with his Complaint that recorded his meals while incarcerated in the BCDC. Plaintiff stated that there were small portions provided, he lost weight while incarcerated at the BCDC, he often felt hungry, and at times the food provided was not fully cooked.

Plaintiff's book-in report showed that Plaintiff weighed 175 pounds, as did his intake medical questionnaire. Defs'. Ex. 1, 2. Plaintiff stated these were not correct and that he was not weighed at the time and should not have signed off on those weights as being correct. Plaintiff agreed he was weighed at every doctor visit while in the BCDC. Those weights, Defs'. Ex. 6, reflect Plaintiff weighed in the low-to-mid 180 pound range during the first part of his incarceration. Plaintiff weighed 190 pounds at his arrival at the ADC, where he was immediately placed after leaving the BCDC, and estimated his weight to currently be around 225 pounds.

Perez specifically remembered instances of being provided a cake with mold on it, dirty trays on various occasions, and an instance of spoiled beans. However, Perez agreed that generally all trays contained a meat or protein, a fruit or vegetable, a

-7-

dessert, a drink, and a bread.  Also, Perez stated that he did not lose weight while at the BCDC.

**Defendants' Version of Events**

Sargent Fry testified that during Plaintiff's incarceration, the cell doors were opened at 5:00 a.m., and then lockout began, confining the inmates to the dayroom until around 11:45 to noon. Around 11:45 to noon, inmates were allowed back into their cells until 1:00 p.m. or longer, and then the final lock-out of the day would last until approximately 9:00 p.m.  Cleaning supplies were generally available after lunch, and then the inmates were again locked out of their cells until the evening.  Inmates could go into their cells to retrieve certain items, but generally the cells remained inaccessible by the inmates during the lock-out periods.

Fry also testified that one cell would be established as the community restroom while the inmates were in a lock-out period. The cell designated as the restroom was the cell most visible to central pod control because there was a direct line-of-sight to this cell.  Fry described the cell as having bunk beds on one wall and a desk, sink and toilet against the opposite wall.  Forty-two to forty-six inmates were estimated to be confined to D149 during the relevant time period.  All of those inmates would have used the cell designated as the restroom during the times of lock-out.  Fry testified that cleaning supplies were passed out on a daily basis,

-8-

and that when Plaintiff requested additional cleaning supplies from him, he supplied them to Plaintiff.

Fry testified that D149 is the sex-offender pod, and although designed for 32 inmates, it often held more due to inmates who were committed to the ADC being held there while awaiting an available bed at the ADC. Despite the overcrowding, inmates not assigned to a bunk were at least given a "boat"[1] to sleep on to keep them off the ground. Inmates also had a mat that was one to one and a half inches thick. If a boat was not provided, inmates received two mats. Inmates who had to sleep on the floor had room to place their mats against the wall with the attached desk, allowing their head to be under the desk and their feet to be at the toilet.

When the pod was overcrowded, some inmates had to sit on the floor when eating meals. As to the food served at the BCDC, inmates received 2000 calories a day, with the exception of inmates working as trustees, who were provided more calories. The meals served at the BCDC were not hot meals and no menu was posted by the BCDC. The food was provided to the BCDC by a food service company, and the menus and meals were dietician approved. The BCDC simply prepared the meals with inmate trustee labor and supervision by the food service company's staff. Deputies were responsible for checking portion size.

---

[1]A boat consists of a plastic shell with a mat placed in it.

Regarding the ventilation issues, there are no fans in the pods or cells, and the temperature in the corner cells can at times be somewhat different than the other cells. However, a maintenance team makes certain that the temperature stays within the guidelines of sixty-five to eighty degrees as the permissible range, and all temperature controls and regulators are computerized and run through maintenance as well.

Fry acknowledged that deputies may forget to return sheets and blankets to inmates when they are allowed to go back to their cells at lunch. Fry knew of one instance when this occurred, but it did not involve the Plaintiff. The inmate uniform consists of a short sleeve shirt and long pants. Fry acknowledged that an inmate having extra clothing in his cell, even if he had it due to the temperature, could be disciplined.

Regarding Plaintiff's claims that he did not receive adequate indigent supplies, Fry testified that additional supplies were available upon request, and that additional toilet paper was always provided to the cell designated as the restroom during lock-out. Holly also testified that additional supplies would be available upon an inmate's request.

At night, the cells have a light that is dimmed, but not turned off, much like a night-light. The constant lighting is a safety precaution which enables the deputies to see into the cell

at all times.  Holly testified that the wattage of the night-light
bulb is less than sixty watts.

**Facts Found by the Court**

In conjunction with this case, the undersigned toured the BCDC
and took judicial notice of the following approximate measurements
and facts regarding an average cell in the BCDC:

- The distance from the toilet to the desk in a cell is 65 inches.

- The distance from the toilet to the bed is 28 inches.

- The distance from the far wall to the bed is 53 inches.

- The mat provided to inmates is one inch thick, 75 inches long and 28 inches wide.

- The boat provided to inmates is 82 inches long and 35 inches wide.

- The light is 89 inches from the floor and when the nightlight mode is turned on, only one bulb remains on.

- It is possible for an inmate to jump down from the top bunk by going off the end of the bunk, and in that manner he would not disturb an inmate sleeping on the floor.

- If a mat is placed in the middle of the cell, the distance to the toilet would be 19 to 20 inches.

**II.  Discussion**

The Court finds the credible evidence presented at the
evidentiary hearing to be that Plaintiff slept on the floor of a

-11-

two man cell, which he shared with two other inmates, while he was
a pretrial detainee.  Having to sleep on the floor put Plaintiff in
close proximity to the toilet, but still at least several inches
away.  It was possible for Plaintiff to place his feet closest to
the toilet, and his head against the farthest wall.  Plaintiff
suffered short durations of hot and cold temperatures, not lasting
more than a week each.  Plaintiff also had trouble sleeping due to
the light constantly remaining on in his cell.  While no hot meals
were served at the facility, Plaintiff maintained a relatively
steady weight, or perhaps even gained weight during his
incarceration.  Plaintiff also received indigent supplies and he
could request additional provisions, if he ran out.  Finally,
Plaintiff was able to clean his cell, even when used as a public
restroom for the pod during the day, at least once a day.  At
times, Plaintiff was able to receive additional cleaning supplies.
The Court also credits Plaintiff's testimony that if additional
cleaning supplies were not provided he suffered foul odors and a
dirty cell.

Because he was a pretrial detainee during the majority of his
conditions of confinement claims, Plaintiff's conditions of
confinement claims are analyzed under the Fourteenth Amendment's
due process clause, instead of the Eighth Amendment's cruel and
unusual punishment clause, which applies to convicted prisoners.
See Bell v. Wolfish, 441 U.S. 520, 535 (1979). However, the Eighth

-12-

Circuit has applied the same standard to conditions of confinement claims based on either the Fourteenth or Eighth Amendment. <u>See Butler v. Fletcher</u>, 465 F.3d 340, 345 (8th Cir. 2006), <u>cert. denied</u>, 550 U.S. 917 (2007); <u>Smith v. Copeland</u>, 87 F.3d 265, 267-68 (8th Cir. 1996).

To state a viable conditions of confinement claim, a pretrial detainee must prove that: (1) objectively, the deprivation was sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health or safety; and (2) subjectively, the defendants were deliberately indifferent to the risk of harm posed by the deprivation.

### A.   Official Capacity Claims

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In <u>Gorman v. Bartch</u>, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the <u>Gorman</u> case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. See <u>Hafer v. Melo</u>, 502 U.S. 21 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. <u>Id.</u> at 24-27. Personal

-13-

> capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. Id. at 25-27.

Gorman, 152 F.3d at 914.

Plaintiff's official capacity claims are tantamount to suing Benton County. Official-capacity liability under 42 U.S.C. § 1983 occurs only when a constitutional injury is caused by "a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). Policy or custom official-capacity liability is imposed by 42 U.S.C. § 1983 only for "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." Id. at 690-91.

Plaintiff's allegations could be construed to allege unconstitutional policies of leaving a light on at all times, of placing three inmates in a cell with two beds, of denial of adequate hygiene items to indigent inmates, of providing inadequate cleaning supplies, of inadequate food, and of extreme temperatures.

Regarding the constant lighting of the cell, it was established that the relevant policy was to dim the lights at night to a "night-light" type light, which allowed guards to see in the cells for safety reasons. As stated above, to establish an

-14-

official-policy claim, Plaintiff must show that he suffered constitutional harm from the policy of leaving the night-light on at all times, and that the night-light policy was the moving force behind his harm.

Plaintiff stated that he lost sleep due to the light being on. However, on October 7, 2009, ten months after his incarceration at the BCDC began, Plaintiff filed a grievance stating he "never had trouble sleeping until now," referring to the snoring of a fellow inmate.   There are no grievances presented where Plaintiff complained of the lighting, although the Court credits Plaintiff's testimony that he did submit some grievances which were not returned.

Plaintiff stated he slept approximately four hours a night, but did not appear to seek any medical or other help for his sleeplessness.  Moreover, Plaintiff did not testify as to any other physical impairment from the constant lighting. See, e.g., Muick v. Reno, Case No. 03-1725, 2003 WL 22952703, at *2 (8th Cir. Dec. 10, 2003) (unpublished opinion) (dismissing a prisoner's § 1983 claim because he "did not allege that he suffered any resulting physical injuries" due to unspecified "lighting problems" in his cell); Wills v. Terhune, 404 F.Supp. 2d 1226, 1231 (E.D. Cal. 2005) (recommending denial of plaintiff inmate's motion for preliminary injunction where plaintiff claimed constant lighting of his cell resulted in problems sleeping, headaches, visual impairment, and

other physical and emotional problems; record indicated three of four light bulbs in cell were turned off at night, and the night light was only bright enough for security concerns and there was no supporting evidence of alleged physical impairment); King v. Frank, 371 F.Supp. 2d 977, 1004-1005 (W.D. Wis. 2005) (ruling that a constant low-level illumination of prisoner's cell during sleep hours does not rise to the level of an Eighth Amendment claim, where health workers found no serious medical consequences from the lighting; plaintiff demonstrated neither "substantial risk of serious harm" nor deliberate indifference to that harm).

Regarding Plaintiff's claim of overcrowding, which forced him to sleep on the floor at times, the only policy which was established at the hearing was that the BCDC needed to accommodate more inmates than it had beds and, therefore, inmates without beds were given a boat or a mat for sleeping on the floor. Again, Plaintiff must establish that the policy of allowing an inmate to sleep on the floor, or placing three inmates in a cell with bed space for two inmates, caused him constitutional harm. In this instance, the Court does not find there to be constitutional harm.

Although inconvenient, Plaintiff established that his harm, at most, was that he was splashed by the urine of a fellow inmate on two to three occasions. Such allegations, even if true, do not rise to the level of a constitutional claim. Goldman v. Forbus, No. 00-2463WA, 2001 WL 838997, at *1 (8th Cir. July 26, 2001)

(holding that third inmate in a cell designed for two people did not suffer unconstitutional punishment when he had to position his mattress near the toilet and for two nights was sprinkled with urine when his cellmates used the toilet).  Without any claim of constitutional harm, it is not possible for the BCDC policy to be a "moving factor" in establishing such harm.  The Court also notes that it was possible for Plaintiff to have positioned himself in such a manner that his feet would be the only body part exposed to any fluids from other inmates using the toilet at night.

The Court also notes that having to sleep on the floor with a boat and/or a mat is likely uncomfortable.  However, Plaintiff stated that of his fourteen months of incarceration at the BCDC, only two to three of them did he spend sleeping on the floor and he had a mat at all times.  It was also indicated that these were not two to three consecutive months on the floor; rather, Plaintiff had to sleep on the floor with a mat or a boat only for periods of up two nights to one week at a time.  The duration of this condition does not rise to the level of a constitutional violation.  See Ferguson v. Cape Girardeau County, 88 F.3d 647, 650 (8th Cir. 1996) (use of a floor mattress for thirteen nights did not violate inmate's rights); Goldman v. Forbus, 2001 WL 838997, *1 (8th Cir. 2001) (unpublished per curiam) (no constitutional violation where pretrial detainee slept six nights on the floor next to toilet).

Plaintiff also established a policy regarding the ventilation and temperatures in the BCDC. According to the policy, the air temperature was to be kept between 65 and 80 degrees at all times. To ensure this standard was met, Defendants utilized a computerized system to monitor and control the temperature and this system was maintained by maintenance staff. There is nothing in Defendants' policy which demonstrates it was a moving factor in causing any constitutional harm. Proper adherence to these policies by BCDC would not result in a violation of Plaintiff's constitutional rights. There is no evidence in this case that the policies were not adhered to whenever possible. The only exception is a seven-day duration when the air conditioning unit required repair. This event was beyond the control of the BCDC, and not a part of any policy or practice. Moreover, upon such an event occurring, the evidence established that the BCDC worked as quickly as possible to replace the malfunctioning part of the air conditioning unit and modified the inmate uniform to allow for more comfortable conditions.

Regarding the cleaning supplies given to the inmates, the policy established at the hearing was that cleaning supplies were given at least once a day. Otherwise, inmates could ask for additional supplies and those would be given as the detention center schedule allowed. Again, adherence to this policy would not result in a violation of Plaintiff's constitutional rights.

-18-

Although Plaintiff may have been exposed to some unsanitary conditions for an overnight duration, the Court can not find that such a limited exposure to a limited level of uncleanliness rises to the level of constitutional harm. See Hutto v. Finney, 437 U.S. 678, 686-87 (1978)(filthy, overcrowded cell might be tolerable for a few days and intolerably cruel for weeks or months); Smith v. Copeland, 87 F.3d 265, 267 (8th Cir. 1996)(court reviews the totality of the circumstances of the inmate's confinement); Whitnack v. Douglas County, 16 F.3d 954, 957 (8th Cir. 1994)(length of time required for conditions to be unconstitutional decreases as level of filthiness increases).

Plaintiff claimed the policy regarding the handing out of indigent supplies was likewise unconstitutional.   However, Plaintiff acknowledged that the only supplies he ever ran out of were toothpaste and soap for two to three days.   This obviously does not rise to the level of a constitutional violation.   Further, while plaintiff may not have been provided with deodorant and this "may have made his life unpleasant, nothing in the Constitution requires [] prison life to be pleasant, and [a prisoner's] rights ... [are] not violated by the lack of deodorant." Snipes v. Witthrop, No. 05-909-WDS, 2007 WL 2229012, at *2 (S.D. Ill. Aug. 2, 2007).

Finally, Plaintiff alleges he was denied adequate nutrition due to the policy by the BCDC of not allowing hot meals, and due to

the quantity of food provided in the meals.  The credible evidence at the hearing established that the meals were dietician approved and provided by a third party to the BCDC.  The BCDC relied on the dietician's menu, and was responsible for preparing the food and monitoring equal distribution of portions among the inmates.  A caloric total of 2000 calories was provided to sedentary inmates such as Plaintiff.  Again, the Court cannot find that this policy is unconstitutional, or that, if adhered to, it would cause constitutional harm.

Part of this claim is also the provision of only cold food at the BCDC.  It was established that the BCDC policy is to provide no hot meals.  The provision of only cold food does not violate the Constitution. See Brown-El v. Delo, 969 F.2d 644, 648 (8th Cir. 1992)("We agree with the district court that Brown-El's claim that his constitutional rights were violated when he was served cold food is frivolous"); Hamm v. DeKalb County, 774 F.2d 1567, 1575 (11th Cir. 1985)(Food that "occasionally contains foreign objects or sometimes is served cold, while unpleasant, does not amount to a constitutional deprivation"), cert. denied, 475 U.S. 1096 (1986); Waring v. Meachum, 175 F. Supp.2d 230, 239 (D. Conn. 2001)("The provision of cold food is not, by itself, a violation of the Eighth Amendment as long as it is nutritionally adequate and is 'prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume

-20-

it'"); <u>Smith v. Copeland</u>, 892 F. Supp. 1218, 1229 (E.D. Mo. 1995)(holding that diet of only cold food, in and of itself, does not offend the Constitution), <u>aff'd</u>, 87 F.3d 265 (8th Cir. 1996).

**B.   Individual Capacity Claims**

As noted above, the remaining Defendants in this case are Holly and Ferguson.   Plaintiff brought forth no evidence to show that any of his alleged deprivations were sufficiently serious to deprive him of the minimal civilized measures of life's necessities, or to constitute a substantial risk of serious harm to his health and safety.   Moreover, Plaintiff brought forth no evidence that the defendants were deliberately indifferent to any risk of harm.

The evidence presented was that when Holly was asked for additional cleaning supplies, he provided them.   If inmates asked Holly for additional indigent hygiene supplies, he provided them. Holly also approved the inmates to wear less clothing than the standard uniform allowed when there was an increase in temperature due to a faulty air conditioning unit.   Otherwise, there was no evidence to establish that Holly was personally involved in any of Plaintiff's claims, or that he did or failed to do anything because he was acting in a way which was deliberately indifferent to Plaintiff's needs.

The same is true of Sheriff Ferguson.   Although Sheriff Ferguson may have had knowledge that Plaintiff was complaining

about the temperature, the cleaning supplies, the ventilation, the lighting, and other matters through letters or grievances, there was no evidence of personal or direct involvement of Sheriff Ferguson in any of Plaintiff's claims. Choate v. Lockhart, 7 F.3d 1370, 1376 (8th Cir. 1993)(prison officials and supervisors may incur liability only for their personal involvement in a constitutional violation or for corrective inaction that amounts to deliberate indifference or tacit authorization of unconstitutional practices). There is no evidence of any personal involvement or tacit authorization of unconstitutional practices by Ferguson. See also Keeper v. King, 130 F.3d 1309, 1314 (8th Cir. 1997) (general responsibility for supervising prison operations is insufficient to establish personal involvement required to support liability).

As there is no evidence Plaintiff's constitutional rights were violated, the Court does not reach Defendants' qualified immunity arguments.

III. **Conclusion**

For the reasons stated above, I recommend the following:

(1) Defendants Petray and Bisbee be dismissed from this matter on Plaintiff's motion, pursuant to Federal Rule of Civil Procedure 41(a)(2);

(2) Plaintiff's Complaint (Doc. 1) be dismissed, and judgment entered in favor of the Defendants, on the entirety of Plaintiff's remaining claims.

-22-

The parties have fourteen (14) days from receipt of this report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.

IT IS SO ORDERED this 19th day of January, 2012.


/s/ Erin L. Setser
HON. ERIN L. SETSER
U.S. MAGISTRATE JUDGE